1

2

3

4

5

6                        UNITED STATES DISTRICT COURT

7                             DISTRICT OF NEVADA

8                                    * * *

9   RANGESAN NARAYANAN and GEORGE    )
    FERNANDEZ,                        )
10                                    )
               Plaintiffs,            )
11                                    )        3:11-CV-00744-LRH-VPC
    v.                                )
12                                    )
    THE STATE OF NEVADA EX REL THE    )        ORDER
13  BOARD OF REGENTS OF THE NEVADA    )
    SYSTEM OF HIGHER EDUCATION, et al.)
14                                    )
               Defendants.            )
15  _____    )

16          Before the Court is Defendants The Board of Regents of The Nevada System of Higher

17  Education ("the Board") and Mark Johnson's ("Johnson") Motion for Summary Judgment.  Doc.

18  #89.[1]  Plaintiffs Rangesan Narayanan ("Narayanan") and George Fernandez ("Fernandez") filed a

19  Response (Doc. #90) to which the Board and Johnson replied (Doc. #108).  Also before the Court

20  is Plaintiffs' Motion to File Under Seal an Exhibit in Support of Their Opposition to Defendants'

21  Motion for Summary Judgment.[2]  Doc. #96.  Finally, Plaintiffs filed Objections to Defendants'

22  Evidence in Support of Their Motion for Summary Judgment (Doc. #91), to which Defendants

23  filed a Response (Doc. #109).

24  _____

25          [1]  Refers to the Court's docket number.

26          [2]  Defendants do not oppose Plaintiffs' Motion to Seal as the Nevada System of Higher
    Education Code section 5.6.2 requires Defendants to maintain the confidences of personnel actions
    with respect to third-party employees.

## I.      Factual Background

Plaintiffs Rangesan Narayanan ("Narayanan") and George Fernandez ("Fernandez") are citizens of the State of Nevada, residing in Washoe County.  Doc. #81, ¶¶ 4-5.  Narayanan's national origin is India.  Doc. #98, ¶2.  Fernandez's national origin is Sri Lanka.  Doc. #97, ¶2. Defendant Marc Johnson ("Johnson") is a citizen of the State of Nevada, residing in Washoe County.  Doc. #81, ¶7.  During the relevant time, Johnson was serving as the Executive Vice President and Provost at the University of Nevada, Reno ("UNR").  Doc. #89, Ex. 1, ¶2.

Narayanan was hired at UNR in 1984 as an assistant professor with a split appointment teaching in the Department of Agriculture Economics[3] and conducting research for the Nevada Agricultural Experimental Station ("NAES").  Doc. #98, ¶4.  In 1990, he was awarded tenure and was promoted to full professor.  Doc. #98, ¶5; Doc. #98, Ex. 1.  In 2000, Narayanan left his position as a faculty member and chair of the Department of Agriculture Economics when he was appointed to the administrative position of Associate Dean of Outreach for the College of Agriculture, Biotechnology, and Natural Resources ("CABNR").[4]  Doc. #98, ¶7.

Fernandez was hired at UNR in 1988 as an Assistant Professor in the Plant Science Department.  Doc. #97, ¶4.  When the Plant Science Department closed in 1990, he was reassigned to the Department of Agriculture Economics.  Doc. #97, ¶4.  In 1994, he was awarded tenure and was promoted to associate professor.  Doc. #97, ¶5; Doc. #97, Ex. 1.  In 2002, Fernandez left the Department of Resource Economics and was appointed to a faculty position as a statistician in NAES.  Doc. #97, ¶6.  In 2004, he was promoted to full professor in NAES.  Doc. #97, ¶7.  In 2007, Fernandez appointed to an administrative position as the Director at the Center for Research, Design, and Analysis ("CRDA").  Doc. #97, ¶8; Doc. #97, Ex. 2.

---

[3]  Plaintiffs do not dispute that the Department of Agriculture Economics would later become known as the Department of Resource Economics.  Doc. #98, ¶4; Doc. #97, ¶4.

[4]  At the time, CABNR comprised the Departments of Resource Economics and Animal Biotechnology, and NAES.

Both Narayanan and Fernandez entered into a series of employment contracts with the Board for the academic years of 2009-2010 and 2010-2011. Doc. #98, ¶9, Ex. 2, Ex. 3; Doc. #97, ¶9, Ex. 3, Ex. 4. Section 5.4.3 of the Nevada System of Higher Education Code ("NSHE Code") integrates the provisions therein with all employment contracts except as varied in writing by the parties to the contract. Doc. #99, Ex. 26, p. U02869. None of Plaintiffs' contracts varied this provision. Doc. #98, ¶9, Ex. 2, Ex. 3; Doc. #97, ¶9, Ex. 3, Ex. 4. Section 1.1(p) of the NSHE Code defines "tenure" as "academic freedom and continuing employment, which may be terminated only for the reasons specified in the [NSHE Code]." Doc. #99, Ex. 26, p. U02835. These reasons include a declaration of "financial exigency" and for "curricular reasons" consonant with the mission of the University. *Id.* at U02869-71.

Section 3.4.6 of the NSHE Code states that a tenured administrator may be removed without cause, reasons, or right of reconsideration of the action, "but shall be reassigned in an appropriate capacity within the member institution in which the appointment with tenure was made." *Id.* at U02853. Sections 5.4.7(a)-(b) further state that if a faculty member is "furloughed, pay is reduced or the faculty member is threatened with lay off or is laid off because of financial exigency or for curricular reasons," the faculty member will be continued in employment "if possible and if such employment does not result in the termination of employment of another faculty member." *Id.* at U02871; Doc. #98, Ex. 4, p. U06729.

Beginning in 2009, the Nevada State Legislature significantly cut spending for higher education. Doc. #89, Ex. 1, ¶3. The first round of budget cuts for the 2010 fiscal year, which began on July 1, 2009, resulted in a $33 million reduction in state funding for UNR.[5] *Id.* In

---

[5] To the extent Plaintiffs object to the admissibility of Johnson and Bruce Shively's ("Shively") affidavits to this effect, their objections are overruled. Doc. #91, Obj. I & II. Pursuant to Federal Rule of Evidence 401, the Court finds that evidence concerning the first round of budget cuts has a tendency to make Defendants' proffered explanation for Plaintiffs' layoffs during the second round of budget cuts more probable than it would be without the evidence. Accordingly, to the extent Johnson and Shively's affidavits concern the impact of the first and second round of budget cuts, they are admissible under Federal Rule of Evidence 402. To the extent Johnson and Shively's affidavits concern the third

1  response to the first round of budget cuts, UNR laid off non-tenured administrative and academic

2  faculty. *Id.* at ¶4. No tenured faculty were laid off in response to the first round of budget cuts. *Id.*

3  A second round of budget cuts, which was mandated at a special legislative session on March 1,

4  2010, resulted in an additional $11 million reduction in state funding for UNR. *Id.* at ¶3. In

5  anticipation of the second round of budget cuts, then President Milton Glick ("Glick") and others

6  determined that UNR would follow a strategic plan in order to preserve those programs and degrees

7  that would best fulfill the mission of the University and provide a strong foundation from which the

8  University could continue to grow. *Id.* at ¶6. In order to identify the programs that would be

9  closed, downsized, or reorganized, UNR undertook a "Curricular Review and Academic Planning

10  Process." *Id.* at ¶7. UNR's Office of Institutional Research gathered information and produced

11  metrics by which to evaluate the performance of various academic programs, departments, and

12  degree programs across the University. *Id.* at ¶9. As the Provost, it was Johnson's responsibility to

13  review the metrics from the Office of Institutional Research and make recommendations to

14  President Glick as to which programs should be retained and which programs should be closed,

15  downsized, or reorganized.[6] *Id.* at ¶10.

16      On March 1, 2010, Johnson issued his initial proposal, recommending, among other things,

17  closure of the Departments of Resource Economics and Animal Biotechnology, and partial closure

18  and reorganization of CABNR. *Id.* at ¶12; Doc. #98, Ex. 4. Johnson presented the proposal to

19  those departments and identified the faculty members who would be affected by the proposal and

20  _____

21  round of budget cuts, Plaintiffs objection is sustained.

22      [6] Johnson testified that "[his] recommendations were based purely on an evaluation of
23  academic characteristics and issues, as well as the metrics provided by the Office of Institutional
    Research. The primary criterial for the review of programs included degrees granted, enrollment in
24  the major, student Full Time Equivalent production, scholarship productivity, external scholarship
    grant award and expenditure performance, "connectedness" or importance to the fulfillment of other
25  programs at the University, centrality to mission, national and international uniqueness of the program
    and other considerations to preserve complementary elements of programs." Doc. #89, Ex. 1, ¶11;
26  Doc. #98, Ex. 4 (curricular review proposal identifying the above primary criteria).

1    the courses they taught.  Doc. #98, ¶12; Doc. #98, Ex. 5.  At that time, neither Narayanan nor

2    Fernandez appeared on the list of faculty in the Department of Resource Economics.  *See* Doc. #98,

3    Ex. 5.  Ultimately, President Glick and Johnson made the final recommendations as to appropriate

4    program closures to the Board.[7]  Doc. #98, Ex. 4, p. U06721.  The Board approved President

5    Glick's final recommendations, including closure of the Departments of Resource Economics and

6    Animal Biotechnology, and reorganization of CABNR, at its June 3-4, 2010 meeting.  Doc. #89,

7    ¶15; Doc. #99, Ex. 1, pp. U02239-84; Doc. #99, Ex. 24.  In conjunction therewith, the Board

8    approved the termination of thirty-four (34) employees total, including classified, administrative,

9    non-tenured, and tenured faculty.  Doc. #89, Ex. 3, ¶5.

10          In addition to the elimination of the aforementioned academic programs, additional

11   administrative positions were eliminated to meet budget cut mandates.  The Office of Research, of

12   which CRDA was a part, sustained significant cuts and could no longer support CRDA, of which

13   Fernandez was the Director.  Doc. #89, Ex. 6, ¶¶4-5.  As the Vice President for Research, Marsha

14   Read ("Read") oversaw CRDA and ultimately determined that Fernandez's position as Director

15   would be eliminated.  *Id.* at ¶6.  On May 20, 2010, Read informed Fernandez that, due to the

16   elimination of his administrative position, he would be reassigned to his tenure home in NAES.

17   Doc. #99, Ex. 2, p. U02826.  Ultimately, however, the Assistant Vice President for Human

18   Resources, Tim McFarling ("McFarling"), determined that no one was tenured in CABNR or

19

20

21         [7] The parties dispute the extent to which the Faculty Senate's failure to vote on the details of

22   CABNR's reorganization proposal complied with the Curricular Review and Academic Planning

    Process.  *See* Doc. #90, p. 8; *see also* Doc. #108, pp. 10-11.  The Court finds this issue to be immaterial

23   as Plaintiffs' do not assert that the decision to close the Department of Resource Economics was

24   improper or motivated by national origin animus.  Rather, the gravamen of Plaintiffs' complaint is that

    they were discriminated against on the basis of national origin when they were assigned to the doomed

25   Department of Resource Economics, while others were assigned to surviving departments.  Moreover,

    Faculty Senate Chair Elliott Parker, who drafted the Curricular Review and Academic Planning

26   Process, testified that the Faculty Senate vote is "advisory to the President at Best."  Doc. #108, Ex. 2,

    34:5-16.

1   NAES.[8]  Doc. #99, Ex. 5, 22:11-21; Doc. #99, Ex. 5, p. U06826.  McFarling determined that

2   Fernandez's tenure home was in the Department of Resource Economics.  Doc. #89, Ex. 11,

3   30:6-9.  Both Johnson and Read made inquiries into other possible assignments for Fernandez, but

4   they were unsuccessful.  Doc. #89, Ex. 1, ¶¶17-18; Doc. #89, Ex. 12; Doc. #89, Ex. 6, pp. U02772-

5   2779.  On June 10, 2010, President Glick informed Fernandez that he was being laid off because

6   the Department of Resource Economics was being closed as part of a reorganization and reduction

7   in size of CABNR.  Doc. #97, Ex. 7.  Thereafter, Fernandez sought reconsideration of the layoff

8   decision.  Doc. #97, ¶19.  On August 27, 2010, the Employment Review Committee recommended

9   that Fernandez's layoff be reconsidered because he left the Department of Resource Economics in

10  2002.  Doc. #99, Ex. 6, p. U02783.  President Glick denied reconsideration on September 3, 2010.

11  Doc. #97, ¶19.

12          On June 7 and 22, 2010, Johnson notified Narayanan of his reassignment from his

13  administrative position to a faculty position in the Department of Resource Economics, effective

14  June 30, 2010.  Doc. #98, Ex. 6.  On June 14, 2010, Johnson informed Narayanan that he was

15  unable to locate an alternative placement for him.  Doc. #98, Ex. 7.  On June 28, 2010, President

16  Glick informed Narayanan that he was being laid off because the Department of Resource

17  Economics was being closed as part of a reorganization and reduction in size of CABNR.  Doc.

18  #98, Ex. 8.  Thereafter, Narayanan sought reconsideration of the layoff decision.  Doc. #98, ¶20.

19  On August 27, 2010, the Employment Review Committee expressed concern regarding the

20  reassignment of Narayanan from an administrative role to a department already identified for

21  closure, but ultimately recommended that Narayanan's request for reconsideration be denied.  Doc.

22  #99, Ex. 6, p. U02757.  President Glick denied reconsideration on September 1, 2010.  Doc. #98,

23  ¶20.

24

25 ───────────────

26      [8] Plaintiffs' Objection to Read's Affidavit to this effect (Doc. #89, Ex. 6, ¶8) is sustained.  Doc. #91, Obj. IV.  Read lacks personal knowledge as to whether Fernandez's tenure home was Resource Economics and as to whether NAES is a tenure-granting department.

1    Plaintiffs filed this action on October 14, 2011.  Doc. #1.  Shortly thereafter, they filed an

2    Amended Complaint, alleging the following claims against the Board of Regents and Johnson:

3    (1) national origin discrimination, (2) age discrimination, (3) violation of procedural due process

4    rights, (4) violation of substantive due process rights, and (5) breach of contract.  Doc. #9.  On

5    September 7, 2012, the Court dismissed every claim but the national origin discrimination claim

6    against the Board.  Doc. #77.  Thereafter, Plaintiffs filed an Second Amended Complaint alleging:

7    (1) national origin discrimination claims against the Board and Johnson, (2) a Nevada age

8    discrimination claim against the Board, and (3) breach of contract claims against the Board.  On

9    May 30, 2013, the Court dismissed Plaintiffs' age discrimination claim and four of their five breach

10   of contract claims.  Doc. #88.  Accordingly, only Plaintiffs' claims for national origin disparate

11   treatment against the Board under 42 U.S.C. § 2000e (Title VII), national origin disparate treatment

12   against Johnson under 42 U.S.C. § 1983, and breach of contract against the Board insofar as it is

13   premised upon a theory of national origin discrimination survive.  On June 19, 2013, Defendants

14   filed the present Motion for Summary Judgment as to all of Plaintiffs' remaining claims.  Doc. #89.

15   **II.    Legal Standard**

16       Summary judgment is appropriate only when the pleadings, depositions, answers to

17   interrogatories, affidavits or declarations, stipulations, admissions, and other materials in the record

18   show that "there is no genuine issue as to any material fact and the movant is entitled to judgment

19   as a matter of law."  Fed. R. Civ. P. 56(a).  In assessing a motion for summary judgment, the

20   evidence, together with all inferences that can reasonably be drawn therefrom, must be read in the

21   light most favorable to the party opposing the motion.  *Matsushita Elec. Indus. Co. v. Zenith Radio*

22   *Corp.*, 475 U.S. 574, 587 (1986); *Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1154

23   (9th Cir. 2001).

24       The moving party bears the initial burden of informing the court of the basis for its motion,

25   along with evidence showing the absence of any genuine issue of material fact.  *Celotex Corp. v.*

26   *Catrett*, 477 U.S. 317, 323 (1986).  On those issues for which it bears the burden of proof, the

moving party must make a showing that is "sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986); *see also Idema v. Dreamworks, Inc.*, 162 F. Supp. 2d 1129, 1141 (C.D. Cal. 2001). On an issue as to which the non-moving party has the burden of proof, however, the moving party can prevail merely by demonstrating that there is an absence of evidence to support an essential element of the non-moving party's case. *Celotex*, 477 U.S. at 323.

To successfully rebut a motion for summary judgment, the non-moving party must point to facts supported by the record which demonstrate a genuine issue of material fact. *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736 (9th Cir. 2000). A "material fact" is a fact "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *See v. Durang*, 711 F.2d 141, 143 (9th Cir. 1983). A dispute regarding a material fact is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248. The mere existence of a scintilla of evidence in support of the party's position is insufficient to establish a genuine dispute; there must be evidence on which a jury could reasonably find for the party. *See id.* at 252.

## III. Discussion

### A. *McDonnell Douglas* Framework

As to Plaintiffs' first two claims for national origin discrimination pursuant to Title VII and § 1983, the Court employs the same burden-shifting framework. *See Anthoine v. No. Cent. Cntys. Consortium*, 605 F.3d 740, 753 (9th Cir. 2010) (finding it appropriate to apply the formal Title VII disparate treatment *McDonnell Douglas* test to § 1983 claim for gender-based employment discrimination under the Equal Protection Clause of the Fourteenth Amendment). In order to establish a prima facie case of disparate treatment under *McDonnell Douglas*, a plaintiff must demonstrate that: (1) he belonged to a protected class; (2) he was qualified for his job; (3) he was subjected to an adverse employment action; and (4) similarly situated employees not in his

protected class received more favorable treatment.  *Anthoine*, 605 F.3d at 753; *see Moran v. Selig*, 447 F.3d 748, 753 (9th Cir. 2006); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  In the context of layoffs, a plaintiff need only show that the lay off "'occurred under circumstances giving rise to an inference of discrimination.'"  *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1281 (9th Cir. 2000) (quoting *Rose v. Wells Fargo & Co.*, 902 F.2d 1417, 1421 (9th Cir. 1990)).  A plaintiff can establish this inference "by showing the employer had a continuing need for [his] skills and services in that [his] various duties were still being performed, or by showing that others not in [his] protected class were treated more favorably."  *Id.* (internal quotation marks and citations omitted).  Finally, Courts have repeatedly emphasized that the burden of establishing a prima facie case in employment discrimination cases is "minimal."  *See St. Mary's Honor Cntr. v. Hicks*, 509 U.S. 502, 506 (1993); *see also Aragon v. Republic Silver State Disposal Inc.*, 292 F.3d 654, 660 (9th Cir. 2002).  If a plaintiff makes out a prima facie case, the burden shifts to defendants to provide non-discriminatory reasons for the adverse action.  *Anthoine,* 605 F.3d at 753.  At this point, "the prima facie case 'drops out of the picture,' and a court evaluates the evidence to determine whether a reasonable jury could conclude that defendants discriminated against [the plaintiff] based on [national origin]."  *Id.* (quoting *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 (9th Cir. 2006).

### B.    Prima Facie Case

Here, the Court finds that Plaintiffs have failed to make out a prima facie case of employment discrimination based on national origin under the aforementioned *McDonnell Douglas* framework.  It is undisputed that Fernandez and Narayanan belong to a protected class based on their national origins—Sri Lanka and India respectively.  *See* Doc. #97, ¶2; Doc. #98, ¶2; *see also* 42 U.S.C. § 2000e—2(a)(1) (enumerating national origin as a protected class).  Moreover, Defendants do not dispute that Plaintiffs were qualified for their jobs.  Nor do they dispute that Plaintiffs were subject to an adverse employment action.  Accordingly, the Court proceeds to evaluate the fourth step under *McDonnell Douglas*—whether the layoff occurred under

circumstances giving rise to an inference of discrimination.

### 1. Similarly Situated Employees Were Treated More Favorably

Here, the Court finds that Plaintiffs have not proffered sufficient evidence to establish that similarly situated employees, who were born in the United States, were treated more favorably. More specifically, Plaintiffs have failed to demonstrate that they are similarly situated in all material respects to those United States-born individuals who were retained. *See Aragon*, 292 F.3d at 660 (citing with approval *McGuinness v. Lincoln Hall*, 263 F.3d 49, 53-54 (2d Cir. 2001) (articulating the minimal showing necessary to establish that co-workers are "similarly situated")); *see also Moran*, 447 F.3d at 755 (citing *Aragon* and *McGuinness* for the proposition that employees need not be identical, but they must be similar in "all *material* respects") (emphasis added); *see also Vasquez v. Cnty. of L.A.*, 349 F.3d 634, 641 (9th Cir. 2003) (explaining that "individuals are similarly situated when they have similar jobs and display similar conduct").  Furthermore, Plaintiffs' statistical data fails to account for any relevant variables other than national origin.  On this basis as well, the Court finds Plaintiffs' prima facie case to be problematic.  *See Coleman*, 232 F.3d at 1281 (finding statistical evidence that employees where similarly situated to be problematic where it did not take into account any other variables other than protected characteristic).  Indeed, when other pertinent variables are factored in, the disparity on which Plaintiffs rely is virtually non-existent.  *See id.* at 1283 (explaining that "[t]o establish a prima facie case based solely on statistics, . . . , the statistics 'must show a stark pattern of discrimination unexplainable on [other] grounds'") (quoting *Rose*, 902 F.2d at 1423).

First, Fernandez asserts that the Associate Director of CRDA, Veronica Dahir ("Dahir"), who was not tenured and worked under his supervision for three years, was similarly situated and treated more favorably because of her national origin.  Doc. #90, p. 12.  However, the fact that Dahir was not tenured and worked under Fernandez's supervision strongly indicates they were not similarly situated.  *See Vasquez*, 349 F.3d at 641 (finding that "[e]mployees in supervisory positions are generally deemed not to be similarly situated to lower level employees").  Moreover,

as the Associate Director of CRDA, Dahir was the principal investigator and primarily responsible for managing various CRDA survey contracts.  Doc. #89, Ex. 6, ¶6; Doc. #97, ¶12.  She was retained in that capacity in order to manage the ongoing survey contracts that UNR was obligated to complete.  Doc. #89, Ex. 6, ¶6.  She continued to perform survey work under those continuing contracts for another year and was then reassigned as a grants analyst for the College of Liberal Arts.  *Id.* at ¶10.  As Fernandez and Dahir had vastly different positions and responsibilities, the Court concludes that Fernandez and Dahir were not similarly situated.

Second, Plaintiffs contend that two of the five administrators who had obtained tenure while appointed in the Departments of Resource Economics or Animal Biotechnology were similarly situated and were treated more favorably because of their national origin.  Doc. #90, p. 12.  Specifically, Plaintiffs cite the fact that the Board gave layoff notices to the three administrators whose national origin is not the United States—Narayanan, Fernandez, and David Thawley ("Thawley")—and retained the other two administrators whose national origin is the United States—Johnson and Nancy Markee ("Markee").  *Id.*  Plaintiffs assert that Johnson and Markee's retentions resulted from their respective tenure homes being changed from the closed Department of Resource Economics to other retained departments.  *Id.*  Here again, the Court rejects Plaintiffs contention that these administrators were similarly situated in all material respects such that an inference of discrimination may be made.

Like Plaintiffs, Johnson obtained tenure in the Department of Resource Economics.  Doc. #99, Ex. 1, 11:7-9.  However, Johnson's administrative position as the Provost and Executive Vice President was not being eliminated during the 2010 curricular review process.  *Id.* at 12:15-20.  On this basis alone, the Court finds that Plaintiffs and Johnson were not similarly situated.[9]  Markee

---

[9]  Plaintiffs contend that Johnson was treated more favorably because his tenure home was changed from the Department of Resource Economics to the Department of Economics. *See* Doc. #90, p. 12.  Johnson testified, and Plaintiffs do not dispute, that because he was continuing in his role as Provost and Vice President, President Glick "determined that [he] should have a continuing tenure home, a place to go back to [] in the eventuality that [he] did not have the administrative position . .

also obtained tenure in the Department of Agricultural Economics, which later became the Department of Resource Economics. Doc. #99, Ex. 12, 11:10-13. During the curricular review process, however, Markee's tenure home was verified to be in the Department of Natural Resources and Environmental Science. *Id.* at 12:10-19. Even assuming Johnson changed Markee's tenure home in order to preserve her employment, Plaintiffs fail entirely to explain how Markee was similarly situated. There is no indication as to whether Plaintiffs and Markee shared similar qualifications or worked in similar capacities. Moreover, even if the Court were to determine that Markee was similarly situated, the fact that she was retained and Plaintiffs were laid off does not indicate a pattern such that an inference of discrimination may be made. *See Morita v. So. Cal. Permanente Medical Group*, 541 F.2d 217, 220 (9th Cir. 1976) (disregarding "statistical evidence derived from an extremely small universe" [e.g., 8 persons] because it has little predictive value) (internal quotation marks and citations omitted).

Third, Plaintiffs contend that eleven of the twenty-three faculty who either obtained tenure while appointed in the Departments of Resource Economics or Animal Biotechnology or were on a tenure-track in one of those two departments were similarly situated and treated more favorably because of their national origin.[10] *See* Doc. #90, p. 13. Plaintiffs assert that the retentions resulted

---

. . . The procedure [for changing Johnson's tenure home] included [President Glick] seeking the approval of the [Department of Economics] to accept [his] appointment as a tenured professor . . . ." Doc. #99, Ex. 1, 12:15-24.

[10] The Court notes that Plaintiffs' evidence as to the number of faculty who were laid off or otherwise not retained is either conflicting or otherwise not entitled to a presumption of truth. First, Plaintiffs submitted evidence indicating that there were twelve (12) faculty members laid off or not retained. *See* Doc. #95, Ex. 5 (submitted under seal) (indicating that Klaus Moeltner ("Moeltner") was laid off and Esmail Zaniani ("Zaniani") was laid off / retired). However, conflicting evidence, also submitted by Plaintiffs, indicates that Moeltner and Zaniani did not receive layoff notices. *See* Doc. #107; Doc. #95, Ex. 34, p. 5 (submitted under seal). Second, Plaintiffs contend that certain faculty who retired to avoid layoff notices should not be included in the Court's calculus of layoffs. However, it is not clear that such an assumption is warranted. *See* Doc. #104 (affidavit of Scott Schonkwiler, testifying that he was offered the option of retiring in lieu of being terminated). Third, Plaintiffs contend that Tuman Wuligi ("Wuligi") was associated with CABNR. However, the only evidence Plaintiffs introduce in support thereof is Narayanan's own affidavit in which he states that he knows

from a change to their tenure homes from the closed Departments of Resource Economics and Animal Biotechnology to other retained departments. *Id.* However, again, Plaintiffs fail entirely to articulate how these tenured or tenure-track faculty were in fact similarly situated in any material way, other than by reference to their association with CABNR. There is no indication that those tenured or tenure-track faculty held similar positions of employment or had similar qualifications.

As to whether the tenure-track faculty are similarly situated, the Court finds that they are not.[11] As non-tenured faculty, these individuals undoubtedly had different expectations as to their prospect for continued employment. Likewise, the Board undoubtedly had different contractual obligations with respect to maintaining their employment. And perhaps the most obvious material distinction is that, as non-tenured faculty, these individuals did not have tenure homes at all. Accordingly, the Court finds that the tenure-track faculty to which Plaintiffs refer are not similarly situated for purposes of establishing a prima facie case of discrimination.

The Court also finds problematic Plaintiffs' contention that those faculty associated with the Department of Animal Biotechnology were similarly situated.[12] Aside from the fact that

---

Wuligi as a former UNR tenure-track faculty member who is no longer employed at UNR. *See* Doc. #98, ¶35. Plaintiffs offer no evidence to indicate what position Wuligi held, in what department Wuligi was employed, or why he is no longer employed at UNR. Moreover, another document submitted by Plaintiffs, which lists the faculty affected by the 2010 curricular review layoffs, does not reference Wuligi. Doc. #95, Ex. 5 (submitted under seal).

[11] Tenure-track faculty at the time of Curricular Review include: (1) Tuman Wuligi—national origin Mongolia (Doc. #98, ¶35); (2) Tamzen Stringham—national origin United States (Doc. #99, Ex. 19, 7:16-8:9); (3) Mike Teglas—national origin United States (Doc. #95, Ex. 33, p. 7 [submitted under seal]); and (4) David Thain—national origin United States (Doc. #105).

[12] Faculty associated with the Department of Animal Biotechnology at the time of Curricular Review include: (1) Maria Almeida-Porada—national origin Portugal (Doc. #100); (2) David Thawley—national origin New Zealand (Doc. #106); (3) Esmail Zanjani—national origin Iran (Doc. #107); (4) Ben Bruce—national origin United States (Doc. #101); (5) Christopher Porada—national origin United States (Doc. #103); (6) Dale Holcombe—national origin United States (Doc. #99, Ex. 16); (7) Barry Perryman—national origin United States (Doc. #99, Ex. 17); (8) Tamzen Stringham—national origin United States (Doc. #99, Ex. 19); (9) David Thain—national origin United States (Doc. #105).

Plaintiffs make no effort whatsoever to explain how or why those individuals were similarly situated, the Court finds their situations to be distinguishable in several important ways.  First, Plaintiffs do not assert that they had similar positions of employment or that they shared any of the same qualifications as those individuals associated with the Department of Animal Biotechnology. Additionally, two of the tenure-track faculty associated with the Department of Animal Biology were ultimately retained in the Department of Agriculture, Nutrition and Veterinary Science ("ANVS").  Doc. #99, Ex. 19, 9:8-25; Doc. #99, Ex. 20, 13:4-18.  However, Plaintiffs do not allege that they were qualified for any of these positions in AVNS.  On these bases, the Court finds that the faculty associated with the Department of Animal Biology were not similarly situated for purposes of establishing a prima facie case of discrimination.

Finally, eighteen of the twenty-three tenured or tenure-track faculty to which Plaintiffs refer as similarly situated held employment as active members of the faculty.  In contrast, Fernandez, Narayanan, and three other individuals held administrative positions.  As active members of the faculty, these individuals held different positions of employment and fulfilled very different roles at the University.  From the Resource Economics Department, three active faculty members, who were born in the United States, were retained—Kim Rollins ("Rollins"), Tom Harris ("Harris"), and Mariah Evans ("Evans").  Rollins was retained and transferred to the Department of Economics in the College of Business because she is experienced and actively involved in Range Management, a program that was retained in the Department of Economics.  Doc. #89, Ex. 14, 93:21-94:7.  Moreover, she had active grants with the Agricultural Research Service in Range Management.  *Id.* Finally, she is a specialist in Environmental Resource Economics, and was the only professor in the department at the time with that official degree designation.  Doc. #89, Ex. 16, 31:14-32:3.  Harris was also transferred to the Department of Economics in the College of Business because he was and is still the Director of the Economic Development Center.  Doc. #89, Ex. 14, 70:25-71:2; Doc. #89, Ex. 15, 7:11-12.  Evans had a joint appointment in the Department of Resource Economics and the Sociology Department.  Doc. #89, Ex. 14, 70:20-21; Doc. #89, Ex.

14

17, 8:20-24.  She was retained and transferred to the Sociology Department.  *Id.*  She also coordinates the Applied Statistics Program and has actively taught statistics courses since coming to the University.  Doc. #89, Ex. 17, 9:16-10:6.  Thus, none of the Resource Economics faculty to which Plaintiffs refer were similarly situated because each of their positions was continuing in some capacity, albeit in different departments.

In sum, the Court concludes that none of Plaintiffs' proposed comparator pools comprises individuals who were similarly situated at the time of curricular review.  As such, Plaintiffs have failed to show that individuals who were similarly situated in all material respects were treated more favorably.

### 2.     Continuing Need For Skills and Service

Here, Plaintiffs assert in a rather conclusory fashion that the Board had a continuing need for their skills and services.  *See* Doc. #90, p. 19.  However, they do not present any evidence that other similarly situated employees were retained to perform the same duties that either Fernandez or Narayanan were performing prior to their layoff.  *See Aragon*, 292 F.3d at 660 (agreeing that plaintiff had put forth sufficient evidence to meet his minimal prima facie burden where he established that similarly situated employees were retained to perform the *same* duties) (emphasis added).   Because the administrative positions in which Narayanan and Fernandez were employed were eliminated as a result of the curricular review process, no one was thereafter retained to performed those duties.  Whether UNR transferred courses from the Department of Resource Economics to the Department of Economics that Narayanan was qualified and experienced to teach is immaterial because he was not teaching those courses at the time in question.  Moreover, whether UNR continued to offer statistics courses that Fernandez developed and taught for more than fifteen years prior to his administrative assignment is immaterial because he was not teaching those courses at the time in question either.  Finally, the fact that Dahir was retained in her role as the Associate Director of CRDA is immaterial because she was retained in order to complete the current survey contracts for which she was the principal investigator and responsible party.  She

was not retained in order to replace Fernandez in his capacity.  Accordingly, Plaintiffs have failed

to establish that UNR had a continuing need for their skills or services.

In sum, the Court finds that Plaintiffs have failed to establish that their layoff occurred

under circumstances giving rise to an inference of discrimination and have thus failed to establish a

prima facie case of national origin disparate treatment.  Nevertheless, even if the Court were to find

that Plaintiffs had established a prima facie case of discrimination under the *McDonnell Douglas*

framework, their claims would still fail as a matter of law because they cannot demonstrate that

Defendants' legitimate, nondiscriminatory reasons for their layoffs are pretextual.

**C.    Nondiscriminatory Explanation**

If a plaintiff makes out a prima facie case, the burden shifts to the defendant to offer a

legitimate, nondiscriminatory reason for the employment action.  The burden is "one of production,

not persuasion; it 'can involve no credibility assessment.'"  *Reeves v. Sanderson Plumbing Prods.,*

*Inc.*, 530 U.S. 133, 142 (2000) (quoting *Hicks*, 509 U.S. at 509). In their Motion for Summary

Judgment, Defendants contend that the undisputed facts demonstrate that "legitimate, non-

discriminatory, business-related reasons" compelled the decisions in the lengthy curricular review

process, the resulting department closures, and the Plaintiffs' ultimate layoffs.  *See* Doc. #89, p. 24.

In support thereof, Defendants cite the state-mandated budget cuts and the subsequent Curricular

Review and Academic Planning Process, which resulted in the elimination of Plaintiffs'

administrative positions as well as the Departments of Resource Economics and Animal

Biotechnology.  *See supra*, pp. 3-6.  Defendants also provided evidence demonstrating that the

faculty to whom Plaintiffs refer as having received more favorable treatment were in fact  retained

because of their qualifications to serve in programs that would be continued, because they were

currently teaching classes that would continue and which were necessary to ongoing academic

programs, because of their connections to current grants, and because of their unique contributions

to the departments and programs that survived the strategic cuts.  *See supra*, pp. 9-14.  Plaintiffs,

on the other hand, could not be retained in another department without causing the termination of

16

another faculty member.  *See supra*, pp. 5-6.

Here, the Court finds that Defendants' explanation, if true, is a legally sufficient, nondiscriminatory reason for Plaintiffs' layoff.  *See Winarto v. Toshiba Am. Elec. Components, Inc.*, 274 F.3d 1276, 1295 (9th Cir. 2001) (holding that a reduction in force constituted a legitimate, nondiscriminatory reason for terminating employee).  Accordingly, Defendants have met their burden of proffering a legitimate, nondiscriminatory explanation for Plaintiffs' layoffs.

**D.    Evidence of Pretext**

If an employer articulates a legitimate, nondiscriminatory reason for the challenged employment action, the presumption of unlawful discrimination "simply drops out of the picture." *Hicks*, 509 U.S. at 510-11.  The burden shifts "back to the plaintiff to raise a genuine factual question as to whether the proffered reason is pretextual."  *Lowe v. City of Monrovia*, 775 F.2d 998, 1008 (9th Cir. 1985) (citing *Texas Dept. Of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255-56 (1981)).  Here, a plaintiff "may defeat summary judgment by offering direct or circumstantial evidence 'that a discriminatory reason more likely motivated the employer,' or 'that the employer's proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not believable.'"  *Anthoine*, 605 F.3d at 753 (quoting *Chuang v. Univ. of Cal. Davis, Bd. of Trs.*, 225 F.3d 1115, 1127 (9th Cir. 2000) (internal quotation marks omitted); *see also Cornwell*, 439 F.3d at 1028-29.  "These two approaches are not exclusive; a combination of the two kinds of evidence may in some cases serve to establish pretext so as to make summary judgment improper." *Anthoine*, 605 F.3d at 753 (quoting *Chuang*, 225 F.3d at 1127) (internal quotation marks omitted).

However, "[t]he distinction between direct and circumstantial evidence is crucial, because it controls the amount of evidence that the plaintiff must present in order to defeat the employer's motion for summary judgment."  *Coghlan v. Am. Seafoods Co.*, 413 F.3d 1090, 1095 (9th Cir. 2005).  "Because direct evidence is so probative, the plaintiff need offer very little direct evidence to raise a genuine issue of material fact."  *Id.* (internal quotation marks omitted).  But, "[w]hen the evidence on which a plaintiff relies is circumstantial, 'that evidence must be *specific and*

*substantial* to defeat the employer's motion for summary judgment.'" *Anthoine*, 605 F.3d at 753

(quoting *EEOC v. Boeing Co.*, 577 F.3d 1044, 1049 (9th Cir. 2009)) (emphasis added); *see also*

*Cornwell*, 439 F.3d at 1029.

Here, Plaintiffs do not dispute that UNR was faced with severe budget cuts that were

mandated by the Nevada legislature.  Rather, Plaintiffs assert that their tenure home assignments in

a department that was slated for closure were more likely motivated by national origin

discrimination.[13]  In support thereof, Plaintiffs do not offer any direct evidence of Defendants'

discriminatory intent.  *See Aragon*, 292 F.3d at 662 (explaining that direct evidence "is evidence

which, if believed, proves the fact [of discriminatory animus] *without inference or presumption*")

(quoting *Godwin v Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir. 1998).  Instead, Plaintiffs

argue that similarly situated individuals outside of their protected class were treated more favorably

because they were assigned new tenure homes in surviving departments in order to preserve their

employment.  *See Vasquez*, 349 F.3d at 641 (a showing that employer treated similarly situated

individuals more favorably is probative of pretext).  Nevertheless, the Court finds that the

circumstantial evidence Plaintiffs set forth is not "specific and substantial" such that it creates a

---

[13] To the extent Plaintiffs argue that the concept of a tenure home is inconsistent with university practice or that their tenure home assignments were somehow improper, the Court has already rejected their position.  Doc. #77, p. 12; Doc. #88, p. 9-10.  The Court reiterates that Plaintiffs' argument regarding the propriety of their tenure home assignments is without merit.  NHSE Code Section 5.4.7(a)-(b) provides that any faculty member who is laid off because of financial exigency or for curricular reasons "shall be continued in employment, *if possible and if such employment does not result in the termination of employment of another faculty member*, in an appropriate qualified professional capacity whin the System institution involved."

Here, Defendants do not deny that a faculty member's tenure home can be changed. Doc. #108, p. 9. Rather, they assert that Plaintiffs' tenure homes were not changed because there were no positions available for them in other departments that were retained after curricular review.  *Id.* at 10. Accordingly, the Court finds that the issue of tenure home is relevant only insofar as a faculty member who would have otherwise been laid off as a result of the budget cuts and subsequent curricular review process is ultimately retained in accordance with NHSE Code Section 5.4.7(a)-(b).  In those circumstances, a retained faculty member's tenure home is changed to reflect his or her continuing employment in another department.  Plaintiffs' tenure homes are immaterial to the Court's analysis because their administrative positions were being eliminated and they could not be retained in any department without displacing another faculty member.

trial issue of material fact as to the ultimate issue of national origin discrimination.

First, the Court finds that the evidence constituting Plaintiffs' prima facie case—assuming Plaintiffs had made a prima facie case—is not alone sufficiently strong to raise a genuine issue of material fact regarding the veracity of Defendants' proffered nondiscriminatory reasons. *See Chuang*, 225 F.3d at 1127 ("a disparate treatment plaintiff can survive summary judgment without producing any evidence of discrimination beyond that constituting his prima facie case, if that evidence raises a genuine issue of material fact regarding the truth of the employer's proffered reasons"). While statistical evidence can, if sufficiently probative, demonstrate bias, mere reference to the number of lay-offs and retentions is not sufficient circumstantial evidence to withstand summary judgment. *See Anthoine*, 605 F.3d at 753 (finding reliance on termination and retention statistics to be questionable where plaintiff did not offer any specific evidence about the circumstances in which the other individuals were terminated); *see also Aragon*, 292 F.3d at 663 (finding that the utility of statistics as circumstantial evidence of discrimination demonstrating pretext depends on all of the surrounding facts and circumstances).

As previously discussed, the Court declines to assign weight to Plaintiffs' proffered statistics because their proposed comparator pools do not comprise individuals who were similarly situated in all material respects such that an inference of discrimination may be made. Moreover, Plaintiffs, evidently, do not take issue with the fact that others who were tenured in the Department of Resource Economics were reassigned to other departments. See Doc. #90, p. 27. Rather, they assert that they were also qualified to be involved with ongoing programs and teach courses that are still being taught today. *Id.* In essence, Plaintiffs believe that, like Rollins, Harris, and Evans, they too should have been reassigned to a department that survived curricular review. However, as the Court previously discussed, Plaintiffs were not similarly situated to Rollins, Harris, and Evans because they held administrative positions that were slated for elimination in the curricular review process. Rollins, Harris, and Evans, on the other hand, were active members of the faculty in positions that survived the curricular review process, albeit in other departments.

Defendants concede that there were courses that Plaintiffs were qualified to teach, but urge that there were no openings in those academic positions.  Doc. #89, ¶19.  Accordingly, they argue, neither Plaintiff could be retained in an academic capacity without displacing other faculty then occupying those positions in violation of NSHE Code § 5.4.8(b).  *See id.*  While Plaintiffs claim that the Board had a continuing need for their services and that there were resources available to retain them without displacing other employees, they do not provide any evidence in support of their claims.  Instead, Plaintiffs merely cite the UNR course catalogue as evidence that the University continues to offer courses that they are qualified to teach.  Narayanan identifies nineteen such courses in the Department of Economics which he claims he is qualified to teach.  Doc. #98, ¶28.  However, even if Narayanan was qualified to teach these courses, he does not allege, or provide any evidence in support of the proposition, that he could have been retained to teach any of those courses without displacing other faculty.  Moreover, Narayanan concedes that there were no vacancies at the time in the Department of Economics or several other departments in which he claims he was qualified to work.  Doc. #99, Ex. 7, 118:18-119:22.  Fernandez also identifies several statistics courses that UNR continues to offer that he developed and taught for more than fifteen years prior to his role as an administrator.  Doc. #90, p. 19.  However, Evans had been teaching at least one of those statistics courses since she came to UNR and was retained in that capacity after curricular review.  Doc. #99, Ex. 14, 9:16-10:4.  Accordingly, Fernandez could not have been retained to teach that class without displacing her.  Moreover, even if Fernandez was indeed qualified to teach the other courses he identifies, he does not offer any evidence to suggest that he could have been retained to do so without displacing another faculty member.

Plaintiffs further assert that "there were funds available to create and support new positions, and UNR advertised for 23 of such positions."  Doc. #90, p. 25.  However, Plaintiffs do not assert that they were qualified for any of these available positions or introduce any evidence that the available positions were in a field related to Plaintiffs' field of study or experience.  Plaintiffs also cite Kurt Pregitzer's ("Pregitzer") resignation as the Department Chair of the Department of

20

Natural Resources and Environmental Science as creating a viable position for Narayanan. *Id.* In particular, Narayanan "felt that a faculty position in that department might be a suitable assignment for [him]." Doc. #99, Ex. 7, 116:9-23. Nevertheless, Plaintiffs present no evidence that Narayanan was in fact qualified for the Department Chair position or that the position was available at all. Moreover, CABNR's Fiscal Officer, Charlene Hart, confirmed that Pregitzer was not replaced. Doc. #108, Ex. 7, ¶6. Instead, his duties were transferred to another retained individual who was paid the Chair stipend of $12,500. *Id.* The remainder of his salary was allocated to the budget cuts sustained by CABNR. *Id.*

Finally, the remainder of Plaintiffs allegations—namely: (1) that UNR authorized the creation and funding of a new position in CABNR's Nutrition Department, (2) that UNR hired a new faculty member for a soft money position in the Department of Economics, (3) that UNR spent over $5 million to search for and hire new faculty, and (4) that NAES had operating funds that could have been used for salaries of CABNR employees with joint appointments to the Experimental Station—amount to nothing more than conclusory allegations that are similarly unsubstantiated by any evidence. *See* Doc. #98, ¶¶22-24.

**IV.    Conclusion**

In conclusion, the Court finds that Plaintiffs have failed to establish a prima facie case of employment discrimination under the *McDonnell Douglas* framework. However, even if the Court were to find that Plaintiffs made out a prima facie case under the *McDonnell Douglas* framework, the Court would still be compelled to conclude that no reasonable jury could find that Defendants discriminated against Plaintiffs based on their national origin. In assessing Plaintiffs' evidence ostensibly showing Defendants' discriminatory motive, the Court finds that Plaintiffs have not met their burden of demonstrating pretext. Accordingly, the Court shall grant summary judgment in favor of Defendants on Plaintiffs' claims for national origin discrimination under Title VII and § 1983. Additionally, because Plaintiffs' breach of contract claim is predicated on the establishment of national origin discrimination, the Court shall grant summary judgment in favor

1    of Defendants on that claim as well.  Finally, as to Plaintiffs' Objections to Defendants' Evidence

2    in Support of Motion for Summary Judgment (Doc. #91), Objections III, V, VI, and VII are

3    overruled as moot.

4

5           IT IS THEREFORE ORDERED that Defendants' Motion for Summary Judgment (Doc.

6    #89) is GRANTED.  The clerk of court shall enter judgment in favor of Defendants and against

7    Plaintiffs in accordance with this Order.

8           IT IS FURTHER ORDERED that Plaintiffs Motion to File Under Seal an Exhibit in

9    Support of Their Opposition to Defendants' Motion for Summary Judgment (Doc. #96) is

10   GRANTED.

11          IT IS FURTHER ORDERED that Plaintiffs Objections to Defendants' Evidence in Support

12   of Motion for Summary Judgment (Doc. #91) shall be OVERRULED in part and SUSTAINED in

13   part in accordance with this Order.

14          IT IS SO ORDERED.

15          DATED this 3rd day of March, 2014.

16

17                                                     _____
                                                       LARRY R. HICKS
18                                                     UNITED STATES DISTRICT JUDGE

19

20

21

22

23

24

25

26

                                                      22